Ms. Massoumi, good to have you here. I'm trying to see if my time has started. You're all right. Okay. May I please go right ahead. Thank you, Your Honor. May it please the court. My name is Miriam Massoumi. And I'm present today on behalf of the petitioner Francois Pierre Lukunku-Tshibangu. In the case before the court today, Mr. Tshibangu is a native and citizen of the Democratic Republic of Congo, who was found on two separate occasions to establish that it was more likely than not that he would face torture if returned to his country. He was found by an immigration judge to merit protection under the Convention Against Torture. The Department of Homeland Security subsequently appealed this decision to the Board of Immigration Appeals, who reversed the decision of the immigration judge. Do you represent him in those proceedings? No, I did not, Your Honor. He was pro se. He was pro se, and he won with the IJ, and then he lost. Yes, Your Honor. Then he won again, didn't he? Yes, the case was remanded. The case came up to this court, and the case was then remanded to the Board of Immigration Appeals to determine the standard of review under Turks and Beholder. And then the board remanded the case back to the immigration judge to enter a new decision on the Convention Against Torture relief. At that time, the immigration judge found for a second time that the facts established that Mr. Chabangu merited protection under the Convention Against Torture. And Mr. Chabangu is now petitioning the court today to determine whether or not the board's decision is supported by substantial evidence in the record. And the board's decision is primarily focusing on three points. It focuses on the fact that, one, Mr. Chabangu was not continuously employed with the armed forces of the Democratic Republic of Congo, which I'll refer to as the FARDC, and the nature of his employment. Secondly, the fact that he went to play soccer in other countries during his time with the FARDC with no consequence from the FARDC. And third, the fact that record does not establish that he would be viewed as a dissident to the FARDC.  He was in the Army from 2000 to 2010. He testified that he was an active member from 2000 to 2010. Now, he does also testify that he was in and out of the Army because there was a war. He spent three years abroad playing soccer while he was in the Army. Yes, Your Honor. Was it an Army soccer team? No, he played soccer separately.  I'm not sure, Your Honor. The record doesn't really reflect that. But he did play abroad in five different countries for three years. It was an officer in the Army? He was given the title of Major without any function. He entered as a volunteer. He worked controlling traffic at the border. That was his job. He was given a salary. He was given a weapon. He received training on how to use that weapon. Sometimes he wore a uniform in the Army. And this was his job. This is what he said was his this was his employment. This was his means of survival. And the fact that he was in this for a period of 10 years demonstrates that he had substantial ties to the F.A.R.D.C. Do you think the torture he's afraid of is coming from the F.A.R.D.C.? Yes, Your Honor. And he testified to the fact that he he came to the United States to attend an anti-terrorism training conference and he failed to attend that conference. He was detained by immigration officials at the time that he entered the United States. He said that he wanted to request asylum and that he did not want to go back to his country. And he testified that he would be punished by the F.A.R.D.C. because he failed to obey their orders. He failed to complete his mission. I thought the immigration judge kept asking him over and over again, well, what would what would what would happen? He kept saying, I don't know. He did. There was an exchange with the immigration judge where he was asked about four or five times as to how he would be perceived if he was to return to the Democratic Republic of Congo. And he stated that he didn't know. But he did state on the joint appendix, page four eighty five, that he would be punished. So he does state that it is in the record that he would be said the punishment would be that you work, but you wouldn't get paid as much as he'd like to get paid for the work. Respectfully, Your Honor, the record does not say that if I could turn your attention, it was on page forty five of the joint appendix. The immigration judge did ask him, you know, are you saying that your failure would be perceived as your opposition to the government in power? And he answered, because, like, as you know, them, if I failed my mission, I would not be able to achieve it. Then I will be punished. So this is what he said would happen to him. He said that he would be punished from there to torture. I think that's what the Board of Immigration Appeals problem was, is that there seemed to be a big leap from not being welcomed home with roses as opposed to being tortured and that it was kind of short on the evidence there. Well, I think that the facts taken as a whole would support the fact that he would be tortured as the immigration judge put in his decision when he was taken. What are the facts he relies on, though, to say he's going to be tortured? He he really the only thing that he testifies to is he does state that he will be punished. However, he does also that's the only evidence of it. It's what he answered when the only issue here is the torture claim, right? That's correct, your honor, whether or not it's more likely than not that he will face torture. That's the what's your best evidence that he's going to be tortured? I think there are a few things, your honor. First, when he was detained by immigration officials, when he came into the United States, he told an embassy worker who was part of the delegation that he would not be and the immigration judge relied on this fact that this individual could then go back and inform the superiors about this. There is also some evidence in the country reports where it does show that the F.A.R. D.C. does commit some harm against its members. Specifically, there was a there was in the 2010 Human Rights Report a note that the F.A.R. D.C. general ordered his soldiers to kidnap another F.A.R. D.C. colonel who had been arrested on charges of insubordination. So the Human Rights Report did show at least one example of an individual who was arrested for insubordination. And the immigration judge also relied on the fact that the detention facilities in the Democratic Republic of Congo are pretty much known as death houses, that people die there, that the conditions are very deplorable. So there is a significant amount of evidence to establish that he would be tortured. Well, look, there's been a lot of time between his asking for asylum and now. And while he was in the army, he didn't wear a uniform. He didn't have an I.D. What makes you think, what makes him think that they'll even remember who he is? Well, with respect to the uniform, he said that sometimes he wore it, sometimes he didn't. So there were occasions where he testified that he did wear a uniform. And with respect to the identification, the immigration judge asked him, do you have any identification to prove that you're in the army? And he said, no, I'm the only proof that I'm the proof. So the immigration judge didn't necessarily ask him if he had an I.D. while he was in the army, in the Democratic Republic of Congo, but only to show if he was in the army, period. So I don't think that necessarily shows that he never had an I.D. when he was in the Democratic Republic of Congo. Rather, the immigration judge just asked him if you had one to prove that you were in the army. I also think that the immigration... The burden is on the alien here to prove that it's going to be more likely than not that he's going to be tortured. And it just doesn't look like, to me, there's very much evidence in the record that he's going to be subject to adverse consequences. And basically, other than the inference that if you get if you go to prison, prison is bad in that country. I'm having a lot of trouble seeing that there's any proof that he would be subject to torture. Well, he was a pro se individual and he was detained during his hearing. Nonetheless, the immigration judge found that his testimony was credible and also cited to case law that said uncorroborated but credible testimony is sufficient to demonstrate the evidentiary standard. Well, can you point us to anywhere in the record where there's any evidence that says this person is going to be tortured when it's more likely than not he's going to be tortured if he goes back to his home country? Well, I think, Your Honor, it had to be looked at in the series of events that would occur that would lead him to be tortured. And the government, for example, argues that there has to be a series of events that has to happen in order for him to show that it's more likely than not that he'd be tortured. And in those series of events, the evidence does support that. For example, the first thing that they say, too, is that the FDRDC would view his failure in taking the anti-terrorism training courses negatively. Well, the testimony presented in the immigration court showed that he informed embassy officials that he was not going to be taking this terrorism course. And as a result, the immigration judge found that this could be told to his superiors back in the Democratic Republic of Congo. Moreover, the human rights report does show that an individual in the FDRDC was arrested on charges of insubordination. So that also demonstrates that his failure could be to attend. The course could be viewed as negatively. He also repeatedly himself testified that he would be he's he failed his mission. And he also said that he would be punished if he goes back. And he was also selected for this anti-terrorism training course for a reason. He stated that it was because he worked at the borders. So he he's known by the FDRDC. They personally selected him. They paid for his visa to come to the United States. They made the travel arrangements. So he could be easily identified as well upon his return to the FDRDC, considering he also had a substantial past connection with them. He was in the army on and off for a period of 10 years. All of these things in the record demonstrate that he would more likely than not face torture. And the FDRDC also has a very bad human rights record. They have in the 2010 Human Rights Report, they have committed crimes against civilians. There are ample examples about them killing people who are viewed as dissidents in the in the country. They arbitrarily detain Congolese citizens, especially those suspected of disloyalty to the government. And the majority of the torture that is conducted in the DRC is perpetrated by the police and the FDRDC. And as a result, the immigration judge's decision was supported by facts in the record. And as such, the Board of Immigration Appeals decision is not supported by substantial evidence. And I would ask the court to reverse the decision of the Board of Immigration Appeals. Thank you very much. Miss Davis Davis, I'm sorry, it's good to have you here. May it please the court, Andrew Ajitas on behalf of the attorney general, this court should deny the instant petition for review because petitioner has failed to meet his burden of proving that it is more likely than not he will be experienced torture in the Democratic Republic of the Congo, the DRC, because there's just a lack of evidence in the record. Now, before I dive into the merits, I just want to talk about the standard of review. This court is reviewing the board's decision under the substantial evidence standard. Which is a highly deferential standard to the board. Now, I'd like to go over a couple of points that petitioner's counsel made. First of all, petitioner was pro se only at his hearings before the immigration judge. As it proceeded up through the board to the board, then back down to the immigration judge, to the board and to this court, he has been represented. The second time he was before the IJ, he had lawyer? Yes, there was no hearing the second time. But at that point, as his notice of appeal was the last document filed pro se. And after that, it was he was represented by counsel. Now, I'd like to go over his army service, which petitioner says is substantial on the board, found that the immigration judge had erred in describing it as substantial. He said he was a volunteer. He says he started in 2000 and went through 2010, but he was in and out of the army. And that was a quote that he gave in that. It's not like it is here. You go in, you go out. He played three years soccer abroad. He directed traffic, but he says he had a title of a major without any function. He had no specific training. Is there any evidence what a major is in the army? No, that was just what he said over here. That's pretty high rank, high ranking off here. Yes. But not he said it was without function. He had no uniform. He had no. As he said, sometimes he wore a uniform. Sometimes he did not. He had no idea or evidence. But when asked about how he would be perceived and Judge Iggy touched upon this on 485 and 486 in the record, there's five instances when specifically asked, would you be perceived you're in opposition to the government policies? He says, I don't know. I don't know about that. Do you know whether you'd be see you would perceive your actions on returning as being in opposition to government policies? Anything can happen. They can think anything. Then they ask him again. And he says, I have no idea because I cannot think at their place. I don't know. Has any other officers left the country and failed their mission, returned or punished? He says, I don't know. Then lastly, they said again, would you be perceived as someone in opposition? He said, I don't know. Five times. I don't know. Again, this is petitioner's burden to show that he would more likely than not be tortured. And there's just not evidence to show that. He said five times. I don't know. And when talked, another point I'd like to make on page 484 is when talked about. I just want to read the exact language he described suffering, which Judge Iggy again touched upon. He talked about suffering as working hard with little pay, nothing about torture, and that's on page 484. Now, about the State Department reports that does not support the petitioner's case either. The State Department reports actually supports the government's position. It says the F.A.R.D.C. has 130 to 150 thousand soldiers. Half are deployed. It's an ineffective unit with weak command and control and with questionable loyalty among its shoulders. Petitioners claiming that they're going to recognize him, that he's going to return and be punished after five years of living here. And the State Department's does not support that conclusion. Now, petitioner also mentioned the immigration judge's finding that if he if he was immediately tortured, then he would be detained in death houses. And in this court, the Fourth Circuit has a recent case, Oxygene, which said Haitian prison conditions do not deplorable Haitian prison conditions do not qualify as cat because there is no specific intent in torture. And that's the same as it would be here just because it's deplorable conditions or considered death houses. As the immigration judge said, it does not qualify for cat protection. Furthermore, that statement by the immigration judge is speculative. Also, talking about the training and how petitioner feared if he because he didn't attend his training, he therefore would be tortured. Petitioner had very little knowledge about the training and it's in the record. He didn't know how he was selected. He didn't know if it was considered a privilege or not. He has conflicting testimony and who actually paid for this training. Sometimes he said the United States government. At another point, he said his F.A.R., excuse me, the D.R.C. government. He had said the conference was in San Antonio. He has a plane ticket for California. His visa says it's for a D.C. training. There's a lot of conflicting testimony and all goes back to the fact that this is petition. How did the I.J. get it so wrong? You make it sound like it's real easy and then you said the I.J. got reversed. It's the same I.J. and the board reversed him twice. So those were five individuals. One board member sat on the panel both times. The immigration judge, as the board pointed out, just missed aired in the major points, which were the Army service. They mischaracterized it as substantial. The military training and how he would be viewed as a dissident. The board said there's just not evidence. There's a lack of evidence to show would be viewed as a dissident and therefore he would be punished because of that. Well, at one point, he said that the basis of the harm would arise from jealousy. Yes, and the board also found how the board, how the immigration judge erred in that. Yes, he said that jealous soldiers would torture him because he was selected for this training and they were not. However, the board touched upon how the immigration judge says they would be in those jealous soldiers would be enraged and found that to be speculative. There's no showing of retaliation by any jealous soldiers based on country reports, any evidence that petitioner has provided in his testimony. And he would have to petition would have to show they still were angry at him after living here for five years, they wanted to torture him after five years, that they could still find him. And that's just not there. This is all speculation. And there's just not evidence to show, which is what the board said in finding that the immigration judge clearly erred in that and relying on that finding. So after taking, there's just not a lack. There's just a lack of evidence to support any conclusion that it is more likely than not, he would be tortured in the DRC. And if the panel has any further questions for me, that's. Thank you very much. Thank you. Appreciate it. Ms. Busumi. Just I'd like to touch on a couple of points very briefly. I just wanted to emphasize that Mr. Shibango at his hearing, he did testify that he would be punished. I understand there was an exchange with the immigration judge where he was asked what he believed, how he believed he would be perceived in which he stated that he didn't know. But ultimately, he stated that he would be punished for failing to attend his mission. Moreover. The immigration judge found that he would be he would be viewed as a dissident, but nexus is not necessarily needed in order to establish eligibility for relief under the Convention against Torture. Motivation doesn't necessarily have to exist in order for an individual to be found eligible for protection under the Convention against Torture. And those are the only other points that I wanted to add. So if the court has any other questions for me, I'd be happy to answer them. Otherwise, I rest the case. We appreciate it very much. Thank you. Thank you. We'll come down to council and then go to our last case. Thank you.
judges: Robert B. King, G. Steven Agee, Henry F. Floyd